UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:14-cr-72-HSM-SKL |
| | ) | |
| CHARLES MASSENGILL, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Defendant Charles Massengill ("Defendant") [Doc. 16] with a memorandum in support of the motion [Doc. 17]. Defendant seeks to suppress all evidence seized during a "parole search" of his residence and all incriminating statements he made thereafter, arguing the search was illegal because it was not reasonable under the totality of the circumstances. Plaintiff United States of America ("the government") has filed a response in opposition to the motion [Doc. 30]. The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) [Doc. 18]. An evidentiary hearing on the motion to suppress was held on January 28, 2015.[1] After fully considering all of the evidence and the parties' arguments, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

---

[1] Initially, the hearing was delayed pending a determination of Defendant's competency; the hearing was held soon after Defendant was found to be competent [Doc. 28]. At the election of the parties, they submitted their respective arguments in written form in post-hearing briefs. Defendant filed his brief on February 9, 2015 [Doc. 33] and the government filed its brief on February 13, 2015 [Doc. 34].

## I.   FACTUAL BACKGROUND

Defendant is charged in a four-count indictment with conspiring to distribute 500 grams or more of methamphetamine, possessing marijuana with the intent to distribute it, possessing a firearm in furtherance of a drug trafficking offense, and being a felon in possession of a firearm.

During the evidentiary hearing, the government presented the testimony of Marshall Hicks, Kevin Chastain, Chad Owenby, and Ben Clayton, all detectives with the Bradley County Sheriff's Office ("BCSO") and Beverly Cameron, a parole officer with the Tennessee Board of Probation and Parole. Defendant testified on his own behalf. The stark differences between the detectives' collective testimony and Defendant's testimony will be addressed herein as relevant.

### A.  Parole

Offenders paroled in states other than Tennessee may transfer their parole to Tennessee through the Interstate Commission for Adult Offender Supervision, and that is what happened in this case. After some 25 years in a Georgia prison and less than one year before Georgia paroled Defendant, he signed an Offender's Application for Interstate Compact Transfer ("First Application"), which sought the transfer of his parole supervision from Georgia to Tennessee. The First Application signed by Defendant and a Georgia prison counselor on September 1, 2010 stated:

> I understand that my supervision in another state may be different
> than the supervision I would be subject to in this state. I agree to
> accept any differences that may exist because I believe that
> transferring my supervision to TN (receiving state) will improve
> my chances for making a good adjustment in the community. I ask
> that the authorities to whom this application is made recognize this
> fact and grant my request for transfer of supervision.
> . . .
> I will comply with the terms and conditions of my supervision that
> have been placed on me, or that will be placed on me by GA
> (sending state) and Tenn. (receiving state).

Case 1:14-cr-00072-TRM-SKL   Document 35   Filed 02/27/15   Page 2 of 23   PageID #: 200

[Government's Exhibit 1].

Defendant signed the First Application while in custody in Georgia in the presence of a counselor. He testified that his counselor told him to sign several documents, including the First Application, if he wanted parole. Defendant indicated he did not read the First Application before signing it. Defendant testified that he has only an eighth grade education and that his reading ability is "kinda fair." Defendant also admitted that he wanted his parole to be transferred from Georgia to Tennessee because he was from Tennessee and it was the state where he could reside with family. Defendant admitted he had no family and no place to live in Georgia.

On January 18, 2011, Defendant signed a Georgia State Board of Pardons and Paroles Certificate of Conditional Transfer ("Transfer Certificate") [Defendant's Exhibits 1 & 2]. The Transfer Certificate form included a standard condition authorizing any *parole* officer to engage in a warrantless search of Defendant, all property under his control, and his residence. The Transfer Certificate also ordered Defendant to contact his Georgia parole officer within 24 hours of his release. The Georgia Department of Corrections placed Defendant on parole around March 19, 2011, but he was then transferred to another facility pursuant to some sort of detainer, and apparently Defendant did not ever report to a Georgia parole officer.

After he was released from the detainer, Defendant first reported to Tennessee parole officer Gary Bender on February 18, 2011. Officer Cameron could not testify as to what actually happened when Defendant first reported to Officer Bender because Officer Bender left the parole office. However, Officer Cameron described the normal process, stating that upon a parolee's arrival to Tennessee, the parolee appears at the parole office, is presented with his Tennessee parole certificate, and a parole officer reviews the parole certificate and conditions of parole with

3

the parolee.  This would include the parole officer's explanation that the parolee must abide by the parole rules of both the sending (in this case Georgia) and the receiving state (in this case Tennessee).  The parolee would then be asked to sign the Tennessee parole certificate containing the standard conditions of parole.  Thereafter, the parolee typically would take part in a group orientation with other parolees, in which the Tennessee parole certificate and conditions of parole would be reviewed again.

Defendant testified that about a month after he arrived in Tennessee, he participated in a discussion of Tennessee parole conditions in a group setting.  He recalled a woman explaining parts of the parole conditions to the group.  From his experience in the Georgia prison and this group meeting, he understood he was subject to a parole search conducted by a Tennessee parole officer, but he remained steadfast that he was never made aware of Tennessee's standard parole condition that allowed warrantless searches by law enforcement officers other than parole officers.

On January 30, 2012, Defendant's Tennessee parole supervision was transferred from Officer Bender to Officer Alison Greer.  During Officer Greer's subsequent review of Defendant's file, she discovered his file did not include a signed Tennessee parole certificate.  To remedy this lack of paperwork, on February 7, 2012, Officer Greer presented, and Defendant signed, a Tennessee parole certificate ("Tennessee Parole Certificate") [Government's Exhibit 2], which reflected various conditions for Defendant's parole with an effective date of February, 2011.  One of the standard parole conditions allows "a search, without a warrant, of [Defendant's] person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time without reasonable suspicion."  The document reflects, and Defendant does not dispute, that Defendant signed the Tennessee Parole Certificate in the

presence of Officer Greer, below a provision that stated he understood and agreed to abide by the parole conditions.

On November 26, 2012, Defendant's supervision was transferred to Officer Cameron. Upon review of Defendant's file, she discovered that for some unknown reason the state of Georgia withdrew the First Application. In order to complete Defendant's transfer and paperwork in the Tennessee parole system, she had Defendant sign a new Offender's Application for Interstate Compact Transfer ("Second Application") [Government's Exhibit 3] on December 4, 2012. The Second Application also contained the language quoted above that Defendant would comply with the terms and conditions of parole placed on him in both Georgia and Tennessee. Officer Cameron testified that Defendant reported to her office once a month and in writing, as he was required, during her supervision.

Officer Cameron stated the Tennessee Parole Certificate is a standard document and that none of the Tennessee parole conditions can be modified in any way. Further, Defendant was required to abide by both the Tennessee and Georgia rules in order to be placed on parole in Tennessee upon his release from custody in Georgia. She was aware of no conversation with Defendant regarding any conflicting requirements, but said Defendant would be required to comply with the Tennessee rules if there was a conflict between the two states' rules.

**B. Search**

Less than a week before the search at issue, a criminal informant told Detective Marshall Hicks that Defendant "was selling large amounts of methamphetamine" and that Defendant stored methamphetamine at his home, in a wooden box in his bedroom beside the door. The informant did not say that he or she had actually purchased or seen a purchase of methamphetamine from Defendant, but the informant reported he or she had seen Defendant

with a large bag of methamphetamine on more than one occasion and had smoked methamphetamine with Defendant. The informant also told Detective Hicks that Defendant was known to have a gun. Detective Hicks, who was not previously aware of Defendant's alleged involvement in drug trafficking, proceeded to investigate the informant's information by locating Defendant's residence and identifying Defendant. During this investigation, Detective Hicks learned that Defendant was on parole in Tennessee.

After learning Defendant was on parole, Detective Hicks visited Defendant's parole officer, Officer Cameron, on May 15, 2014. Detective Hicks confirmed with Officer Cameron that Defendant remained on parole, he shared with her the information provided by the informant, and he requested a copy of Defendant's Tennessee Parole Certificate so that he could conduct a parole search of Defendant's person, home and property. Officer Cameron provided Detective Hicks with a copy of Defendant's Tennessee Parole Certificate, but she did not accompany Detective Hicks to Defendant's home for the search. Officer Hicks stated that over his one-to-two-year tenure working narcotics with the BCSO (where he had worked in law enforcement for about 11 years), he had conducted three other warrantless searches on parolees or probationers using their Tennessee conditions of parole/probation to authorize the search. In each case, the parole/probation officer did not participate in the search.

Immediately after obtaining the Tennessee Parole Certificate, Detective Hicks and other BCSO officers went to Defendant's home around 3:00 p.m. Two men were leaving the premises as the officers arrived, and they were allowed to leave. Under the detectives' version of events, Defendant answered their knock at the front door, they provided him a copy of his Tennessee Parole Certificate and explained their intent to conduct a parole search, Defendant allowed them to enter his home without objection or question, and Defendant sat on the couch in the living

6

room and appeared to read (and reread) his Tennessee Parole Certificate. Several detectives credibly testified that Defendant was not detained or handcuffed at this time.

Under the Defendant's starkly contrasting version of events, he was laying in his bed when he heard cars pull up next to his home. Defendant got up, partially opened the front door, and saw the detectives. Defendant testified the detectives pushed the door open, entered his home without permission, immediately handcuffed him, searched his person, emptied his pockets, and placed what they found in his pockets on the coffee table. Only then, according to Defendant, did the detectives provide him with a copy of his Tennessee Parole Certificate. While Defendant admitted that he was shooting methamphetamine in May of 2014, he denied it made him high and he denied using methamphetamine the day of or the day before the search. Defendant said that it made "the girls" happy for him to use methamphetamine so he used it and pretended it made him high Defendant admitted he had "given" methamphetamine to the two girls present the day of the search.

According to Detective Hicks, once inside the home he recognized an odor of cut marijuana that got stronger as he approached Defendant's bedroom. Detectives Hicks, Chastain, and Owenby went to and began the search of Defendant's bedroom. Detective Clayton remained in the living room with Defendant and the two girls but neither the girls nor Defendant were restrained at that time. In the bedroom, Detective Chastain observed a wooden box, which contained about one ounce of suspected methamphetamine in a plastic cup, which was resting on top of Officer Cameron's business card. Immediately thereafter, Detective Owenby returned to the living room and asked Detective Clayton to detain and handcuff Defendant.

Detective Clayton testified that in order to handcuff Defendant, he extended the reach of his handcuffs by joining two sets of handcuffs and he handcuffed Defendant with his hands

behind his back.  He then read Defendant his Miranda rights.  Detective Clayton said he properly placed the handcuffs on Defendant with his hands behind his back and a finger of space between the shackle and the wrist.  Detective Clayton testified, and Defendant did not contradict, that Defendant at no time complained the handcuffs were too tight.  Defendant, however, testified that, as a result of him being too tightly handcuffed, he suffered and continues to suffer from pain in his wrist.  Defendant further testified that sometime later a doctor at the Bradley County jail examined his handcuff injury and said his hand had a "bible bubble."

As the bedroom search continued, Detective Hicks located a pistol under a pillow on Defendant's bed.  In plain view on the floor of an open bedroom closet, Detective Owenby observed approximately five pounds of marijuana in an open garbage bag.  Next to the marijuana was a large (about a foot tall) metal can with "potato sticks" handwritten on the lid.  Detective Owenby shook the can and perceived that the noise emitted from the can was not consistent with the weight or sound of potato sticks; he also noticed the can had no label or glue from a removed label.  The officers also located a locked toolbox and a safe or lockbox in the closet.

Detective Owenby testified he asked Defendant what was in the safe and for a key to the safe, and that Defendant willingly provided him with the keys.  Defendant testified to the contrary, stating he did not provide the keys; they were taken out of his pockets without permission during the search of his person when the detectives first entered his home.  In any event, the locked safe was opened with the key and more than $128,000.00 in cash was found. The locked toolbox was found to contain methamphetamine, marijuana, currency, and a set of digital scales.

In light of the criminal informant's tip, the proximity of the can to other controlled substances, that the can was "out of place" in the bedroom closet as no other food items were

located therein, that the can was too heavy for and did not sound like it contained potato sticks, and the officers knowledge, training, and experiences, the officers discussed their authority to open the can. Because the officers were not sure they could open the can as part of a warrantless parole search, they consulted with a state district attorney by phone and were advised they could open the can. Detective Owenby then cut open the can and found approximately 2.4 pounds of suspected methamphetamine. Numerous photographs of the seized contraband were entered into evidence [Government's Exhibits 4-16].

After the search was completed, BCSO/Drug Enforcement Administration Task Force Officer Carl Maskew arrived. He read Defendant his Miranda rights again, moved the handcuffs restraining Defendant from the back to the front, and questioned Defendant. According to the detectives, Defendant orally stated he understood his rights and made incriminating statements in response to custodial interrogation.

## II. ANALYSIS

Defendant's motion objects to the parole search and moves to suppress the resulting evidence on the ground that the search was unreasonable under the totality-of-the-circumstances standard applicable to such searches. The government agrees on the standard, but contends the search was entirely reasonable.

### A. Credibility

A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002). In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic. *See United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005). After considering each witness's demeanor, descriptive account of the events, and overall impression, I **FIND** the detectives and the

9

probation officer gave credible testimony.  Significantly, Defendant has not challenged the credibility of any of the government's witnesses in any of his arguments.  In contrast, Defendant's testimony is suspect given his claim that intravenously injected methamphetamine has no effect on him.  After careful consideration, I **FIND** the officers' testimony to be a fully credible and an accurate account of the relevant events at issue in this motion and I **FIND** Defendant's testimony to be less than fully credible where it significantly differs from the testimony of the officers.

### B.  Parole Search

#### a.  Standards

The basic tenant of Fourth Amendment jurisprudence that a warrantless and suspicionless search by the police is unconstitutional has relatively few exceptions.  One such exception, a warrantless and suspicionless search of a parolee's person, property, and home, referred to as a parole or parolee search herein, is at issue in this case.

As the Sixth Circuit recently explained,

> A probationer's [or parolee's] home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'"  *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).  However, probationers, like parolees, "do not enjoy the 'absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'"  *Id*. at 874, 107 S.Ct. 3164 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).  In fact, "the Supreme Court has made clear that the nature of the relationship between state actors and individuals subject to state supervision in lieu of or following release from prison alters the relevant analysis under the Fourth Amendment." *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007).

> The Supreme Court has identified two justifications under which a parole-authorized warrantless search may be found reasonable under the Fourth Amendment.  First, the Court in *Griffin*

10

recognized that a state's operation of a probation system "presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin*, 483 U.S. at 873-74, 107 S.Ct. 3164. The Court upheld the search of a probationer's home pursuant to a state regulation that authorized a warrantless search when a probation officer had "reasonable grounds" to believe the probationer was in possession of contraband. *Id*. at 870-71, 107 S.Ct. 3164. Then, in *Knights*, the Court recognized that a police officer's search of a probationer's home pursuant to a probation condition authorizing the search with or without a warrant or probable cause could be reasonable under the "totality of the circumstances." *United States v. Knights*, 534 U.S. 112, 118-19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). If a warrantless search is reasonable under either *Knights* or *Griffin*, it need not pass muster under the other. *Herndon*, 501 F.3d at 688.

*United States v. Payne*, 588 F. App'x 427, 431 (6th Cir. 2014) (alteration in original) (footnote about the Court's extension of *Knights* to parolees omitted).

In *Knights*, defendant was placed on probation and subject to a probation order which required that he submit to search at any time, with or without a search warrant or reasonable cause, by any probation or law enforcement officer. *United States v. Knights*, 534 U.S. 112, 114 (2001). He signed the probation order immediately below a statement indicating he had read and understood his probation conditions and would abide by them. *Id*. Relying heavily on *Knights*, the Supreme Court in *Samson v. California* held that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee when the parolee agrees to be subjected to search at any time as a condition of parole. 547 U.S. 843, 857 (2006). In doing so, the Court stated that "parolees are on the continuum of state-imposed punishments," and the "acceptance of a clear and unambiguous search condition significantly diminishe[s] [the parolee's] reasonable expectation of privacy." *Id*. at 850, 852 (internal quotation marks and alterations omitted). Furthermore, the Court in *Samson* held that "because parolees are more likely to commit future criminal offenses, the State's interests are substantial and as was made

11

clear in *Knights*, the Fourth Amendment does not render the states powerless to address these concerns effectively." *United States v. Tessier*, No. 3:13-00077, 2014 WL 4851688, at *4 (M.D. Tenn. Sept. 29, 2014) (quoting Samson, 547 U.S. at 850) (internal quotation marks, alterations, and emphasis in original omitted).[1]

### b. Reasonableness of Parole Search

Post-hearing, Defendant concedes that "broadly speaking, suspicion is not required for a parolee search; that parolee[s'] expectations of privacy are lessened because of their release status, even more so than that of probationers; and that the State has a 'substantial' and/or 'overwhelming' interest in supervising parolees." [Doc. 33 at Page ID # 176]. Defendant also expressly agrees with the government that this matter is to be determined based upon the reasonableness of the search under the totality-of-the-circumstances test articulated in *Samson*.

"Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848 (citations and internal quotation marks omitted). As held by the Sixth Circuit,

> The question here is one of reasonableness, as the warrant and probable cause requirements generally do not apply to searches of parolees, probationers or their residences. That means we must consider the degree to which the search intrudes upon an

---

[1] The Tennessee Supreme Court also finds that "[o]n the continuum of possible punishments and reductions in freedoms, parolees occupy a place between incarcerated prisoners and probationers. Tennessee's statutory scheme defines parole as "the release of a previously incarcerated prisoner to the community prior to the expiration of the prisoner's term subject to conditions." *State v. Turner*, 297 S.W.3d 155, 162 (Tenn. 2009) (citations, internal quotation marks, and alterations omitted) (adopting the reasoning of *Samson*). "Release on parole is a privilege and not a right . . . ." *Id*. citations and internal quotation marks omitted). "Under Tennessee's statutory scheme, persons released outside of prison walls on parole remain in the legal custody of the warden (or relevant penal supervisor) and are subject to all of the provisions upon which their parole is conditioned." *Id*. at 162-63 (citations omitted). "Parolees remain under the confinement of their sentences while on parole." *Id*. at 163.

individual's privacy as well as the degree to which it is needed for the promotion of legitimate governmental interests. One factor central to this balancing inquiry is an individual's status on the privacy continuum. At one end of the continuum are free citizens, who enjoy absolute liberty. Probationers have fewer expectations of privacy than free citizens and parolees have still fewer expectations of privacy than probationers. At the other end of the spectrum are inmates, who have no legitimate expectation of privacy from searches of their prison cells.

*United States v. Smith*, 526 F.3d 306, 308-09 (6th Cir. 2008) (citations, internal quotation marks, and alterations omitted).

In his post-hearing brief, Defendant somewhat refined his argument to assert that "if there exists any protections against unfettered searches of parolees, those protections call for suppression under these facts. This case involves an instance where law enforcement has made parolee searches an investigative tool with a specific eye to avoiding the warrant requirement and its need for sufficient justification for a search and the limitations placed on the scope of searches by warrants." [Doc. 33 at Page ID # 175]. Defendant continues to contend the search was unreasonable because: "(1) The circumstances of the transfer of the defendant's parole from Georgia to Tennessee would not have caused him to consider the significant differences in the parole conditions he agreed to in Georgia and those he agreed to in Tennessee[;] (2) Upon information and belief the information provided to law enforcement was not significant such as to justify the magnitude of the search herein[;] (3) The defendant was immediately detained by being handcuffed. In fact, he was handcuffed in such a manner and for such a period of time as to cause physical injury[;] (4) No parole officer was present for the search[; and] (5) Officers had no suspicion that drugs would be in the sealed can." [Doc. 33 at Page ID # 177]. Although the arguments will be addressed separately herein, in line with the way they were raised by

Defendant, the arguments also will be considered in combination to address the totality of the circumstances.

### 1. Transfer of Parole from Georgia to Tennessee

A standard parole condition in Tennessee provides for a warrantless, suspicionless search. *Turner*, 297 S.W.3d at 167. Defendant's Tennessee Parole Certificate clearly sets forth the search condition, including any law enforcement officer's ability to search Defendant's person, property, and residence without a warrant or reasonable suspicion. As held in *Turner*,

> The point of the standard search condition used by Tennessee's Board of Probation and Parole is to alert parolees that law enforcement officers will be able to search them and their premises without the usual necessity of first obtaining a judge's or magistrate's permission. Parolees are thus informed prior to their release that their constitutional rights regarding searches and seizures have been severely reduced.

297 S.W.3d at 167 n.12.

As witnessed by various probation officers and a prison counselor, Defendant signed documents indicating he had read or had read to him the conditions of his transfer and parole. During the course of the evidentiary hearing on the motion to suppress, however, Defendant testified he either felt he had to sign the documents to be released or he did not fully read the documents he signed. In other words, it appears Defendant is contending that he did not have notice of, and did not give an effective consent to, a warrantless search by any law enforcement officer. Nevertheless, Defendant does not contend that any lack of understanding on his part, standing alone, justifies suppression and he acknowledges that he understood his person, property, and home were subject to a warrantless search by a Georgia probation officer [Doc. 33 at Page ID # 179]. While Defendant complains that he did not understand the magnitude of any differences between standard parole conditions in Georgia and Tennessee, he admits he

voluntarily requested the transfer and was given an opportunity to review all pertinent paperwork. Although Defendant disputes he actually read the Tennessee Parole Certificate or that his parole officer reviewed the conditions with him, he does not dispute that he is able to read even though he has a limited education. Defendant also does not dispute that his signed Tennessee Parole Certificate states he understood the conditions and agreed to them.

I **FIND** that Defendant's assertion that he failed to understand he was subject to warrantless and suspicionless searches by any law enforcement officer is not credible. It is far more credible that in exchange for an early release from jail to his family in Tennessee, Defendant knowingly made certain concessions, including the search condition at issue in this case. Defendant was given an opportunity to read and participate in a group discussion about the conditions. Defendant has not contended that he voiced questions or concerns about the conditions of his parole at the times he signed the various relevant documents, even though he had that opportunity. Instead, Defendant signed the conditions indicating his agreement to be bound by the conditions, and I **FIND** he is bound by those conditions.

Even if Defendant somehow failed to grasp the full extent of his parole conditions in Tennessee, the Court in *Samson* specifically declined to analyze a parole search under a consent theory. 547 U.S. at 852 n.3. In *Smith*, the Sixth Circuit also expressly declined to rest its decision upholding a search pursuant to search conditions on a consent rationale, "explaining that the written condition was but one 'salient' factor in the 'totality of the circumstances pertaining to a parolee's status.'" 526 F.3d at 311 (quoting *Samson*, 547 U.S. at 852) (citing *Wilson v. Collins*, 517 F.3d 421, 426-27 (2008) (refusing to confine *Samson* to situations in which a

suspicionless search is expressly authorized by a parole agreement)).[2]  Defendant cannot now

escape the consequences of his parole conditions by claiming he did not either voluntarily or

knowingly sign the agreement.  *See Samson*, 547 U.S. at 852 (holding that parolee who signed an

order submitting to a search condition was "'unambiguously' aware of it") (quoting *Knights*, 534

U.S. at 119).

Accordingly, I **FIND** that Defendant is bound by the standard search provision in his

Tennessee Parole Certificate as a condition of his release on parole in Tennessee.  I further **FIND**

that the circumstances of his transfer to parole in Tennessee, and the corresponding imposition of

the standard Tennessee conditions of parole as a result, do not render the search at issue

unreasonable.

### 2.   Magnitude of the Search

Defendant argues the information provided to law enforcement by the criminal informant

was not significant enough to justify the magnitude of the search, pointing out that Detective

Hicks acknowledged that he conducted parole searches when he did not have probable cause

sufficient to obtain warrants in this and three other cases.  To the extent this argument complains

that law enforcement did not possess probable cause or reasonable suspicion because the

criminal informant's reliability is unknown, it ignores that Defendant's conditions of parole

provided for a search without regard to probable cause or reasonable suspicion.  The courts have

repeatedly acknowledged that a state has an overwhelming interest in conducting such searches

because parolees are more likely to commit future criminal offenses, and the courts have also

---

[2] The Fifth and Eleventh Circuits have taken an even broader view, finding no written condition
or statute permitting such a search is even necessary.  *See United States v. Keith*, 375 F.3d 346,
350 (5th Cir. 2004) (declining to require "either a written condition of probation or an explicit
regulation permitting the search of a probationer's home on reasonable suspicion"); *United
States v. Yuknavich*, 419 F.3d 1302, 1310-11 (11th Cir. 2005) (same).

acknowledged that a state's interests in reducing recidivism and promoting reintegration and positive citizenship among parolees warrant the diminished expectation of privacy. *See e.g., Samson* at 854, 857.

As to the search itself, I **FIND** the "magnitude" was entirely proper. Defendant was given a copy of his Tennessee Parole Certificate. The officers went straight to the bedroom of interest, where they smelled marijuana and located a number of objects consistent with the resale and use of controlled substances, including a gun and a large amount of cash. While the officers opened the hinged lid of the unlocked wooden box, opened a locked safe and toolbox using a key supplied by or taken from Defendant, opened a dresser drawer, and opened a unlabeled, sealed, and out-of-place can, I **FIND** the magnitude of the search did not exceed the bounds of reasonableness.

### 3. Detention and Handcuffs

As to Defendant's contention that he was immediately detained, the detectives' credible testimony does not bear out Defendant's claim. The detectives credibly testified they did not detain Defendant until after they had located methamphetamine, marijuana, and drug paraphernalia. At that time, I **FIND** that the detention of Defendant was reasonable.

To the extent Defendant now complains the handcuffs were too tight, he offers no authority that would invalidate the evidence gathered from the search even if this claim was found to be credible. In addition, even if the handcuffs were subjectively tight, Defendant did not so complain to the detectives. The detectives consistently testified to the contrary regarding the methodology and timing of handcuffing Defendant. In the absence of a contemporaneous complaint by Defendant, and based on the credible testimony of the detectives, I **FIND** the timing, method, and manner of handcuffing Defendant to have been entirely reasonable.

17

### 4. No Parole Officer Present

Defendant's parole officer did not initiate or participate in the search, and she apparently had no suspicions whatsoever regarding Defendant's possession of contraband prior to Detective Hicks meeting with her the day of the search. Defendant strenuously objects to the absence of his parole officer during the search, although he also appears to acknowledge that the presence of his parole officer was not required under the Tennessee Parole Certificate. The underlying premise of his argument appears to be his contention that Detective Hicks uses a parolee's status as a "pretext" for an investigative search and to avoid the necessity of obtaining a search warrant to conduct further investigation. Defendant, however, does not cite any case law supporting his position that doing so results in an unreasonable search requiring exclusion. Instead, Defendant quotes from *Pennsylvania Board of Probation and Parole v. Scott* for its recognition that a parole officer's role is "more supervisory than adversarial." 524 U.S. 357, 368 (1998) (citing *Griffin*, 483 U.S. at 879). Defendant does not explain how this supervisory role furthers his cause. Perhaps if the government had sought to justify the search at issue as a "special needs" search under *Griffin*, which recognized that a state's operation of a probation system may justify departures from the usual warrant and probable-cause requirements, 483 U.S. at 873-74, the lack of a probation officer's involvement might bear further mention. Here, however, the search was not justified under the *Griffin* standard, and the lack of participation by Defendant's parole officer does not render the search unreasonable.

Defendant also implies much based on Detective Hicks' testimony that he has conducted three other warrantless searches of parolees/probations upon learning of their potential involvement in drug trafficking. Detective Hicks indicated he did not attempt to obtain a search warrant in such cases because he had no need to do so. Detective Hicks conceded that in each of

his three prior parole/probation searches, he lacked probable cause to obtain a warrant. Additionally, while Detective Hicks testified he thought there were limits on parole searches as they must be reasonable, he also thought a parole search was not as limited as a search defined by a warrant. Indeed, Defendant's observation that Detective Hicks has added parole searches to his "toolbox of investigative techniques" in preference to obtaining a search warrant appears to be accurate. Yet, this observation is unavailing because it focuses on law enforcement's *motivation* to conduct a search without probable cause for obtaining a warrant. While an inquiry regarding the officer's motivation might remain relevant under *Griffin's* special-needs exception, it is decidedly not relevant under a totality-of-the-circumstances standard. *See Payne*, 588 F. App'x at 432 (holding an officer's motivation has no application when a search is justified under *Knight*'s totality-of-the-circumstances standard).

Defendant has not indicated how the presence of his parole officer would have in any way altered the reasonableness of the search. As both the well-established precedent and the Tennessee Parole Certificate allow for a warrantless, suspicionless search by any law enforcement officer, Defendant's argument that the search was unreasonable because it was not conducted by a parole officer fails. I **FIND** that neither the so-called "pretext" to conduct the search nor the lack of a parole officer's participation renders the search unreasonable.

### 5. Sealed Can

As to Defendant's focus on the sealed "potato sticks" can, he cites only one case, *Robbins v. California*, 453 U.S. 420 (1981), for the unremarkable proposition that there is "a strong expectation of privacy or privacy interest in closed containers." *Robbins* was overruled by *United States v. Ros*s, 456 U.S. 798 (1982). Even if not overruled, however, *Robbins* would have little relevance as it did not involve a parole search pursuant to conditions of parole.

In *Ross*, the Court held that police officers who have probable cause to believe that contraband is concealed somewhere within a stopped automobile may conduct a probing search of compartments and containers within the vehicle. *Id*. at 800. The Court further held, "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search," including the opening of "closets, chests, drawers, and containers in which the [contraband] might be found." *Id*. at 820-21. Defendant has not challenged in any way the detectives' description of the can or the reasons they believed it might contain contraband, and *Ross* supports the opening of the sealed can.

In a case cited by both parties, *United States v. Whisnant*, 545 F. Supp. 2d 713 (E.D. Tenn. 2008) (Varlan, J.), this Court declined to suppress a search in a homicide case where law enforcement cut into an obviously, freshly modified area of sheetrock wall and found evidence of that homicide. As Defendant acknowledges, the crux of *Whisnant* is that the object sought may establish limits on the area reasonably searched. As a result, when searching for drugs, law enforcement can look in any area where those drugs might be hidden. In other words, the scope of a lawful search is defined by the object of the search and the places in which there is cause to believe the object of the search may be found. *Ross*, 456 U.S. at 827. Accordingly, the determination as to whether a search is constitutionally reasonable depends on all of the circumstances surrounding the search or seizure, as well as the nature of the search or seizure itself. As justification for searching the sealed can, Detective Owenby credibly testified that it felt heavy for its described purpose, it seemed out of place, it was located near other controlled substances, and it did not sound like it contained potato sticks, as hand labeled, and it could hold contraband.

20

Defendant's suggestion that he was merely a parolee whose sealed container was subjected to a destructive search on a "whim" has no basis in the credible facts. To the extent Defendant complains the can was destroyed when opened, reasonable destruction of property to effectuate a proper search does not violate the Fourth Amendment. *Whisnant*, 545 F. Supp. 2d at 716. That the detectives first discussed among themselves and then sought legal advice regarding opening the can does not diminish the reasonableness of the search. What is reasonable depends on the context and the circumstances within which the search takes place. Given Defendant's status as a parolee, his signed agreement to the search condition, and the wealth of incriminating evidence located prior to opening the sealed can, I **FIND** the search and "destruction" of the can was reasonable and did not infringe on Defendant's diminished expectation of privacy.

### 6. Totality of the Circumstances

Although none of the individual factors or arguments raised by Defendant indicates the search was unreasonable, the totality of the circumstances must also be considered. While it is not even necessary that Detective Hicks have a reasonable suspicion to initiate a parole search under Defendant's conditions of parole, he did have a basis for investigation based on the criminal informant's information. Moreover, there is no evidence the search was in any way arbitrary, capricious or harassing. *See United States v. Widener*, No. 3:08–CR–01, 2008 WL 4831344, at *3 (E.D. Tenn. Nov. 4, 2008) (Jordan, J.) (holding that "[t]he Supreme Court, for all intents and purposes, has decided that a parolee who has signed a search condition [providing for warrantless searches by law enforcement officers at any time] has no Fourth Amendment rights, subject only to a protection from arbitrary, capricious or harassing searches").

*Turner* offers examples of what might be considered unreasonable searches: "[A] pattern of repetitive searches while the parolee is at work or asleep would be unreasonable. Searches intended to cause the parolee some harm would be unreasonable. A search conducted out of personal animosity would be unreasonable." 297 S.W.3d at 167. In this case, the search was not repeated; it was not conducted at an unreasonable hour; it was not prolonged; it was not oppressive; and, to the extent motivation is even considered, it was not motivated for an illegitimate purpose or by any animosity; it was initiated based on a desire to investigate a criminal informant's information.

Having considered the degree to which the search intruded upon Defendant's diminished expectation of privacy as well as the degree to which the intrusion was needed for the promotion of legitimate governmental interests, and after examining the facts and circumstances of the present case, I **CONCLUDE** the manner and scope of the search and subsequent seizure of items was entirely reasonable.

### C. Statements

Turning to Defendant's claim that his incriminating statements should be suppressed because the search was unlawful under the fruit-of-a-poisonous-tree doctrine, I **FIND** there is no "poisonous tree" because the search was lawful; thus, Defendant's statements cannot be considered fruit of the poisonous tree. At the hearing, Defendant did not testify about the Miranda warning he received or his waiver; he did not argue that either his rights warning or waiver was in any way unconstitutional. In addition, he expressly elected not to pursue this argument at the hearing. Therefore, I **FIND** the government has met its burden to prove by a preponderance of the evidence that Defendant was given a proper rights warning and that he knowingly and voluntarily waived his rights. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226

(1973); *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008) (*overruled on other grounds as recognized in United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011)).  Accordingly, there is no basis to suppress Defendant's incriminating statements.

### D.  Good Faith

Because the motion to suppress fails on the grounds addressed above, it is not necessary to address the government's alternative "good faith" argument.

## III.  CONCLUSION

For the reasons stated above, I **RECOMMEND**[3] that Defendant's motion to suppress [Doc. 16] be **DENIED**.

s/*Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).